UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSEPH FETCHICK III,

              Plaintiff,

v.                                         **Case No:  6:15-cv-96-Orl-28TBS**

DONALD F. ESLINGER, as Sheriff of
Seminole County, Florida,

              Defendant.

## ORDER

Joseph Fetchick III brings this action pursuant to 42 U.S.C. § 1983 alleging that Donald F. Eslinger, the Sheriff of Seminole County, Florida, violated his right of intimate association under the U.S. Constitution when he terminated Fetchick's employment as a deputy sheriff.[1]  The Sheriff moves for summary judgment, (Doc. 60), and for the reasons that follow this motion must be granted.

## I.    Background

Fetchick began his employment with the Seminole County Sheriff's Office (SCSO) in 2008 as a Court Security Deputy.  (Fetchick Dep., Ex. A to Doc. 60, at 25–26).  After serving in that role for five years, in 2013 Fetchick requested and was granted a transfer to the position of School Resource Deputy; he was then assigned to Milwee Middle School (Milwee), reporting to Sergeant Neal Fowler.  (Id. at 29, 40, 42, & 44; Transfer Request Form, Ex. 3 to Fetchick Dep.).  As a School Resource Deputy, Fetchick's duties were "[t]o interact with the students and the teachers and the faculty, secure the school, [and] deal

---

[1] The Sheriff is sued only in his official capacity.

with any issues that come [up], whether it be law enforcement or just mentoring." (Fetchick Dep. at 42; accord Job Description, Ex. 5 to Fetchick Dep. (describing the major function of a School Resource Deputy as "[p]ro-actively perform[ing] law enforcement work in the protection of life and property" and "provid[ing] law enforcement and other community and educational support services to the Seminole County schools and the surrounding community," and listing duties including "[i]nterfac[ing] with students during class presentations, class breaks, meal periods, before[] and after school")). Fetchick was the only deputy stationed at Milwee, (Fetchick Dep. at 43), and his assigned workday at the school was from 8:45 a.m. to 3:50 p.m., Monday through Friday, (id. at 46), though Fetchick testified in his deposition that he was permitted to leave the campus for half an hour for lunch, (id. at 49–50).

Fetchick married in 2009, but in April 2013 he and his then-wife, Michelle, separated. (Id. at 59). Fetchick filed for divorce in May 2013 and the divorce was finalized in 2015. (Id. at 58 & 9; Ex. 15 to Fetchick Dep.). Michelle and Fetchick have three children together, including a son born in September 2013 while they were separated.

Interactions between Michelle and Fetchick were contentious after the April 2013 separation. For example, on May 28, 2013, Fetchick called a deputy—directly, not through dispatch—for assistance, reporting that Michelle was following his vehicle. (Report, Ex. 6 to Fetchick Dep.). And on October 27, 2013, Michelle's grandmother complained in writing to SCSO that three deputy sheriffs went to her house even though there was no incident there and she had not called SCSO; she stated in that complaint that she felt that Fetchick "is using his position to intimidate and harass [her] and [her] household." (Ex. 7 to Fetchick Dep., at 4). In response to that complaint, Inspector Mark Conway of the SCSO

2

Professional Standards Division sent Michelle's grandmother a letter informing her that Fetchick had "received verbal counseling from Sergeant Fowler" and "has been directed not to contact other deputies to investigate matters of a personal nature in the future." (Ex. 7 to Fetchick Dep., at 1).

On November 1, 2013, Sergeant Fowler sent an email to his lieutenant summarizing a conversation he had with Fetchick:

> I met with [Fetchick] and told him in the future if he felt that he needed law enforcement intervention into his personal life he would need to contact dispatch via the non-emergency line or 911 if it was an emergency type of a situation. He was not to contact a specific Deputy Sheriff and involve them. I also told him that his wife (not divorced yet) had made allegations involving another employee of the sheriff's office and him and that she had even gotten threatening text messages from said employee and that [Fetchick] should keep this between him and his wife only and if he felt law enforcement intervention was needed he needed to do so by calling dispatch. . . . I also explain[ed] to him about letting this interfere with his job and also taking care of personal issues while at work. He did tell me none of this is occurring with his [SCSO] phone, it is all on his personal phone. I told him if it was harassment to him then to just turn off his phone until he was off duty and to deal with it after he was off work. . . . I explained to him that we wanted him to know we were there for him and we are trying to keep him from getting jammed up. He asked me when they did child exchange at Panera Brea[d] in Lake Mary if he could have a deputy standby. I told him that I know those calls still exist and if he felt it was necessary to go ahead and do that. I told him he cannot be in uniform or driving a [SCSO] car, and he told me that he knew that and he is always off duty. He did allege being battered in the past at these exchanges by her which is why he inquired about the standby.

(Fowler 11/1/2013 email, Ex. 8 to Fetchick Dep., at 2). Fowler also noted in this email: "I then cautioned him about having a relationship with a married [SCSO] employee and also reminded him that he was still married. He acknowledged this information." (Id.).

The married SCSO employee to whom Fowler referred in this email is Valencia LaRue, a 21-year SCSO veteran who in 2013 was a sergeant on the road patrol night shift. (See Fetchick Dep. at 71; LaRue Dep., Ex. B to Doc. 60, at 11, 16–18). LaRue supervised other deputies but not Fetchick, with whom she had been friends since 2010. (LaRue Dep.

at 25).  LaRue and her husband separated in July or August 2013, (LaRue Dep. at 24),

and sometime in 2013 LaRue and Fetchick began dating; by the end of 2013, their

relationship had become sexual.

As evidenced by a citizen's complaint she filed with SCSO on December 4, 2013,

Michelle believed that LaRue and Fetchick had become sexually involved much earlier in

2013.  Michelle stated in that complaint:

> Sgt. Valencia LaRue gave her sister and another person my cell phone number.  The two people texted me harassing messages.
>
> Deputy Fetchick gave Sgt. LaRue my height, weight, and date of birth and encouraged her to file an inju[n]ction against me.  Sgt. LaRue filed today.
>
> The two officers have been having an affair since February and their relationship is toxic to myself and three children.
>
> Sgt. LaRue has encouraged Deputy Fetchick to be very nasty towards me, which is why we are now at this point.
>
> I am now afraid to meet Deputy Fetchick at any location due to the har[]assment from Sgt. LaRue's family and injunction.

(Ex. 9 to Fetchick Dep.).

Shortly after she filed her December 4 complaint, Michelle produced her iPad to

SCSO and reported that there were messages on the iPad that evidenced misconduct by

LaRue and Fetchick.  (Conway Dep., Ex. D to Doc. 60, at 25–26).  Michelle alleged that

LaRue and Fetchick were meeting for sex while on duty.  (Id. at 26).  Michelle turned her

iPad over to SCSO and consented to a search of it.  The iPad had captured thousands of

text messages exchanged between LaRue and Fetchick on their personal cellular

telephones since September 2013.  (Id.).  Based on those text messages, on December 6,

2013, the Sheriff authorized and directed Inspector Conway to conduct an administrative

investigation of Fetchick and LaRue.  (Memorandum from Eslinger to Conway, Ex. 11 to

Fetchick Dep.; Conway Dep. at 28).   Fetchick and LaRue were placed on paid administrative suspension pending completion of that investigation, though they were not told the nature of the allegations against them at that time.   (Ex. 10 to Fetchick Dep.; Fetchick Dep. at 82; LaRue Dep. at 37).

During his investigation, Inspector Conway gathered evidence and interviewed witnesses, including Fetchick and LaRue, other SCSO employees, Milwee personnel, and a Milwee student.   On March 4, 2014, Inspector Conway issued a 55-page Administrative Investigation Report regarding the allegations against LaRue and Fetchick.   (Administrative Investigation Report, Ex. 19 to Fetchick Dep.).   Inspector Conway's report noted that between September 30, 2013, and December 6, 2013, LaRue and Fetchick exchanged approximately 6,000 text messages while at least one of them was on duty, as well as 750 messages while Fetchick was working extra duty details.   (Id. at 4).   Many of the messages were sexually explicit,[2] including one in which Fetchick sent LaRue a photograph of his penis while LaRue was on duty in November 2013.   It is undisputed that these messages, including the message with the photograph of the penis, were exchanged.   (See Fetchick Dep. at 129).   In his Report, Inspector Conway concluded from a series of messages sent on October 10, 2013, that on that date Fetchick left Milwee in the early afternoon and traveled to LaRue's residence to have sex.   (Administrative Investigation Report at 49–50).

---

[2] When Inspector Conway interviewed LaRue as part of his investigation, LaRue "indicated [that] Fetchick only sent her 'one' sexually explicit text message"—referring to the penis photograph—even after Inspector Conway pointed out to her "that many of the messages . . . described sexual acts in great detail."   (Administrative Investigation Report, Ex. 19 to Fetchick Dep., at 40).   Despite LaRue's opinion to the contrary, the Court can state without equivocation that many of the text messages were indeed sexually explicit and salacious—so much so, in fact, that the Court finds them unsuitable for inclusion in this Order and will not quote them.

Inspector Conway reached that conclusion even though Fetchick and LaRue both denied that Fetchick went to LaRue's house and maintained that the October 10 messages were just "role playing" or "clowning" and that it was a "hoax." (See id. at 34–35, 37–38, & 52). Inspector Conway also concluded from a text message exchange on October 23, 2013, that LaRue went to Fetchick's residence that evening during her shift to have sex with Fetchick. (Id. at 12–13, 52). LaRue and Fetchick denied that LaRue did so. (Id. at 35 & 38).

Inspector Conway's Report also noted that Fetchick and LaRue admitted that Fetchick signed LaRue up for extra duty details using LaRue's login information, which violated SCSO General Order 31 regarding use of the computerized "PowerDETAILS" system.[3] (Id. at 34 & 37). Additionally, the Report described a text message exchange in which Fetchick and LaRue discussed Sergeant Fowler in an unfavorable and disrespectful manner. (Id. at 14 & 50). Further, in the Report Inspector Conway discussed testimony that Fetchick gave during a January 2014 court hearing regarding Fetchick's request for an injunction against Michelle.[4] During that hearing, Fetchick denied "having an affair" with LaRue, and he told Inspector Conway during his investigation interview that he believed that testimony was truthful even though his relationship with LaRue had become sexual by at least November 2013; he did not regard it as "having an affair" because he had been separated from Michelle since May 2, 2013. (See Administrative Investigation Report at 36; Interview Transcript, Ex. 18 to Fetchick Dep., at 9).

---

[3] General Order #31, § X.M.2.c. provides that prohibited actions include "[s]igning up for details for another Deputy Sheriff and/or allowing another Deputy Sheriff to sign up for details on your behalf." (Ex. F to Doc. 60, at 15).

[4] Both LaRue and Fetchick filed requests for injunctions against Michelle in December 2013.

Additionally, the Report described witness accounts of two incidents at Milwee.  One involved Fetchick handcuffing a student even though that student had not committed a crime (Administrative Investigation Report at 33–34), and the other involved Fetchick making a remark to a pregnant Milwee teacher suggesting that Fetchick was the father of her unborn child,[5] (id. at 32–33).  Further, the Report noted that the principal of Milwee "relayed several incidents [to Inspector Conway] in which she needed [Fetchick's] assistance and he was not on campus and had not notified anyone" and that the principal had counseled Fetchick about his remark to the pregnant teacher.  (Id. at 32, 51).

Ultimately, Inspector Conway's Report sustained six violations of SCSO General Orders against both Fetchick and LaRue; the Report made findings but did not make any recommendations about what, if any, action should be taken against them.  (Report at 52). Specifically, both were found to have violated:  (1) General Order #1, XI.B.1., Conduct Unbecoming[6]; (2) General Order #1, XI.C.2. Duty Assignments, which provides that "[e]mployees shall not be absent from duty, post or assignment without authorization" (Ex. E to Doc. 60, at 7); (3) General Order #1, XIV, Conduct Toward Supervisors, Subordinates, and Peers, which provides in part that employees "shall treat their superiors, subordinates, and peers with respect" and "shall be courteous and civil at all times in their relationships with one another," (id. at 12); (4) General Order #1, II. Scope, which provides that employees "will not engage in any conduct that constitutes neglect of duty, conduct unbecoming, or any act likely to adversely affect the discipline, good order, or reputation

---

[5] The teacher told Inspector Conway that Fetchick used the words "my unborn child," and another school employee who witnessed the incident recalled Fetchick referring to himself as "the baby daddy." (Administrative Investigation Report at 32–33).

[6] "Conduct Unbecoming" appears in Section XII.A.1.—not XI.B.1.—of General Order #1. (See Ex. E to Doc. 60, at 6–9).

of the Sheriff's Office," (id. at 1); (5) General Order #31, X.M.2.c. PowerDETAILS— Prohibited Actions; and (6) General Order #1, XII.C.2. False Statements and Reports, which provides that "Employees are required to fully, truthfully, and directly answer all questions or render relevant material in Sheriff's Office Supervisory Inquiries and Administrative Investigations," (id. at 10). (Administrative Investigation Report at 41–52).

On March 24, 2014, the Sheriff issued a Notice of Proposed Discipline to Fetchick, concurring with Inspector Conway's findings that Fetchick committed six General Order violations and stating:

> The violations relating to your conduct will not be tolerated in this agency. Your actions are completely inappropriate and contrary to our values and philosophies as an organization. Your pattern of conduct reflects poorly on you and this agency. At a minimum, your demonstrated lack of judgment in these matters calls your ability to serve as a deputy sheriff into question. Due to the severe nature of these violations, I am proposing to terminate your employment as a deputy sheriff.

(Notice of Proposed Discipline, Ex. 20 to Fetchick Dep., at 2). The Notice informed Fetchick that he was entitled to a meeting with the Sheriff prior to the termination becoming finalized. (Id.).

On April 9, 2014, LaRue retired from SCSO effective March 18, 2014. (Ex. 26 to Fetchick Dep.; see also LaRue Dep. at 56–58). On April 11, 2014, Fetchick met with the Sheriff and was represented by counsel. (Notes, Ex. 21 to Fetchick Dep.; Fetchick Dep. at 125–26). During that meeting, Fetchick's counsel made arguments to the Sheriff challenging the proposed termination, stating in part "we are not aware of any policy actually violated" and denying that Fetchick ever left his shift early to meet LaRue. (Ex. 21 to Fetchick Dep., at 1; see also id. at 2 ("I understand you are concerned about what happened but no policies have been violated. If policies have been violated, we do not know what policies they are. . . . [T]here is not any policy we have seen against texting

8

between two employees. . . . The term for this would be extreme punishment.")). The Sheriff indicated that he would consider counsel's comments. (Id. at 2).

A week later, on April 18, 2014, the Sheriff issued a Notice of Final Discipline to Fetchick, reiterating the findings in the Notice of Proposed Discipline and stating:

> I met with you and your attorney, Jason Harr, on April 11, 2014. During our meeting, your attorney stated that you had not violated any policies, but you would be amenable to counseling. Contrary to your attorney's assertions, the violations that were sustained during the course of this investigation are numerous, and directly reflect on your ability to serve as a deputy sheriff. Not only did you impair the efficiency of this office with your conduct, you were dishonest in your dealings both within the agency and outside of it, and you were disrespectful both to your supervisors and members of the public. Due to the severe nature of these violations, I have decided to terminate your employment as a deputy sheriff.

(Ex. 22 to Fetchick Dep., at 2). The Notice informed Fetchick that he could appeal the Sheriff's decision to the SCSO Civil Service Board, (id.), and three days later Fetchick did so, (Appeal Letter, Ex. 23 to Fetchick Dep.).

The Civil Service Board held a hearing on Fetchick's appeal on August 25, 2014. (Hr'g Tr., Ex. 25 to Fetchick Dep.). At that hearing, the board heard testimony from four witnesses—the principal of Milwee, the pregnant Milwee teacher whom Fetchick offended with his remark, the SCSO forensics investigator who retrieved the text messages from the iPad, and Inspector Conway. (Id.). Fetchick did not call any witnesses. (Id. at 60). At the conclusion of the hearing, the Civil Service Board upheld the Sheriff's decision to discipline[7] Fetchick, noting especially that Fetchick admitted the PowerDETAILS violation. (Id. at 76–79).

---

[7] The Civil Service Board Chairman explained at the beginning of the hearing that the Board decides "whether there is just cause or a reasonable basis for the discipline itself. We don't modify or change the discipline. We don't have the power or the ability to do that." (Hr'g Tr., Ex. 25 to Fetchick Dep., at 4–5).

Fetchick filed this lawsuit on January 23, 2015. (Compl., Doc. 1).[8]   In his Second Amended Complaint (Doc. 29), Fetchick asserted a violation of his constitutional right to freedom of intimate association (Count I) and a violation of due process (Count II).   In a prior Order, the Court granted the Sheriff's motion to dismiss the due process claim, and only Fetchick's intimate association claim remains for resolution. (Order, Doc. 55).   The Sheriff now seeks summary judgment on that claim. (Mot., Doc. 60).   Although Fetchick responded to the motion, he did not do so in a timely fashion, and the Court struck his response memorandum. (Order, Doc. 67).[9]

## II.    Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party bears the burden of establishing that no genuine issues of material fact remain.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).   However,

---

[8] Fetchick and Larue ultimately married on June 2, 2016. (LaRue Dep. at 5).

[9] The Sheriff filed his motion for summary judgment on October 21, 2016—the day that it was due under the Case Management and Scheduling Order (Doc. 27). Fetchick's opposition was due within thirty days after being served with the motion. (Doc. 27 at 6). On the morning of Monday, November 21, 2016, Fetchick moved for a 45-day extension of the response deadline. (Doc. 61).   That motion was referred to the assigned United States Magistrate Judge, who denied the motion that afternoon, noting that Fetchick had not presented good cause for the extension. (Order, Doc. 62).   The deadline passed without a response from Fetchick.   Two weeks later, however, on December 6, 2016, Fetchick filed a response to the Sheriff's summary judgment motion, providing no explanation for its lateness and failing to request acceptance of it despite its untimeliness. (Doc. 63).   The Court struck the response, noting that the response was untimely and was filed in defiance of the magistrate judge's Order denying the extension of time. (Doc. 67).

summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." <u>Gargiulo v. G.M. Sales, Inc.</u>, 131 F.3d 995, 999 (11th Cir. 1997). A "district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." <u>United States v. One Piece of Real Prop., 5800 S.W. 74th Ave., Miami, Fla.</u>, 363 F.3d 1099, 1101 (11th Cir. 2004).[10]

## III.    Discussion

To prevail on his intimate association claim, Fetchick "must [first] demonstrate that []he had a constitutional right and that []he suffered 'adverse employment action for exercising that right.'" <u>Chesser v. Sparks</u>, 248 F.3d 1117, 1124 (11th Cir. 2001) (quoting <u>McCabe v. Sharrett</u>, 12 F.3d 1558, 1562 (11th Cir. 1994)). The Sheriff argues that he is entitled to summary judgment because Fetchick did not have a constitutional right to have an extramarital affair with LaRue and no reasonable jury could conclude that he was terminated due to his intimate association with LaRue. Because the Court agrees that the record evidence does not present a genuine issue of material fact regarding whether LaRue was terminated because of an intimate association rather than for the reasons

---

[10] The Court has considered the merits of the motion and has not granted it merely on the basis that it is in essence "unopposed" after the striking of Fetchick's response. Moreover, nothing in Fetchick's response—which the Court reviewed seeking an explanation of its lateness—would have altered the conclusions reached in this Order in any event.

stated by the Sheriff, the Court need not reach other issues; in other words, even assuming that Fetchick and LaRue's relationship enjoyed constitutional protection, there is no evidence of causation in this case.

In Smith v. Price, 616 F.2d 1371 (5th Cir. 1980), a case involving an extramarital relationship, the former Fifth Circuit[11] held that "[t]he proper legal framework for resolution of the question whether termination of employment was 'caused' by a plaintiff's participation in protected activity was established by the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977)." Id. at 1376 (parallel citations omitted). "Under Mt. Healthy, when a dispute arises concerning whether a discharge was effected pursuant to a permissible or an impermissible reason, the plaintiff has the burden to show . . . that [constitutionally protected] conduct was a 'substantial' or 'motivating' factor in the termination decision." Id. (citing Mt. Healthy, 429 U.S. at 287); cf. McCabe v. Sharrett, 12 F.3d 1558, 1565 n.5 (11th Cir. 1994) (noting that the Mt. Healthy analysis applies in free speech cases "where the employer denies taking the adverse employment action solely because of the public employee's exercise of speech rights" but finding it unnecessary to address whether that analysis applies in the intimate association context). Here, the evidence does not support an inference that the extramarital affair itself—rather than on-the-job conduct that violated SCSO policies—was a substantial or motivating factor in Fetchick's termination.

In the Notice of Proposed Discipline and the Notice of Final Discipline, the Sheriff did not mention the extramarital affair as a reason that Fetchick was being terminated. In

[11] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

those Notices, the Sheriff listed the six General Order violations and the facts supporting each violation. First, the Sheriff sustained the violation of General Order #1, XI.B.1., Conduct Unbecoming,[12] based on: the exchange of over 6,000 text messages while either Fetchick or LaRue was on duty, many of which were sexually explicit and one of which contained a picture of Fetchick's penis; the handcuffing of the Milwee student; the comment to the pregnant Milwee teacher; and Fetchick's testimony at a January 2014 domestic injunction court hearing denying that he had an affair with LaRue despite admitting to Inspector Conway that he and LaRue had become sexually involved by November 2013. (Notices at 1).

Fetchick does not contest that the thousands of text messages were exchanged or that he sent the photograph to LaRue while she was on duty, (Fetchick Dep. at 129); instead, he only questions whether that conduct was inappropriate and asserts that the texting between him and LaRue did not violate any policy. (Id. at 123–24 ("There's no policy stating I can't text anybody. . . . I text anybody during the work day."); id. at 129 (agreeing that his position is that he had the right to send thousands of text messages while on duty and that he feels that there was nothing wrong with doing that)). Fetchick also

------

[12] As noted earlier, "Conduct Unbecoming" appears in Section XII.A.1.—not XI.B.1.—of General Order #1. This section provides:

> Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect favorably on the Sheriff's Office. Unbecoming conduct shall include that which violates the values and organizational philosophy of the Sheriff's Office, canons of ethics or written directives, that which brings the agency into disrepute or reflects discredit upon the individual as an employee, and that which impairs the operation or efficiency of the Sheriff's Office.

(Ex. E to Doc. 60, at 9).

acknowledged that the Milwee student that he handcuffed had not committed a crime, but Fetchick said he was just showing the student "what it would be like for him in the future if he gets arrested" and did not think he did anything wrong. (Administrative Investigation Report at 36). Although the student denied to Inspector Conway that the incident upset him, (id. at 34), a Milwee employee told Inspector Conway that during the incident Fetchick said to the child, "This is what happens, how does it feel?" and that the child cried during the incident, (id. at 33). Both that employee and another viewed Fetchick's actions as inappropriate and reflecting negatively on him as an SCSO employee, (id. at 33–34).

Fetchick also disputes the specifics of what he said to the pregnant teacher, but two employees heard the comment as reported by that teacher, and Fetchick told Inspector Conway during the investigation that when the principal called him into her office after the teacher complained, he told the principal "okay fine I said it whatever" and "It won't happen[] again." (Id. at 36; Fetchick Interview Transcript, Ex. 18 to Fetchick Dep., at 10). And with regard to his January 2014 court testimony in which he denied that he was having an affair despite elsewhere admitting a sexual relationship with LaRue by November 2013, Fetchick maintains that the testimony was truthful because he had separated from his wife in May 2013. (Administrative Investigation Report at 36).[13]

Fetchick disagrees with the SCSO's assessment that his conduct constituted "conduct unbecoming," but that disagreement does not aid him here. And the fact that

---

[13] In an affidavit in support of her December 4, 2013 request for an injunction against Michelle, LaRue attested that Michelle was making "false accusations that [LaRue] is cheating with [Michelle's] estranged husband." (Fetchick Interview Transcript, Ex. 18 to Fetchick Dep., at 8). Fetchick acknowledged in his interview with Inspector Conway that that statement was "deceptive" because they had begun a sexual relationship by the time the affidavit was submitted to the court. (Id.).

there was no specific policy forbidding "excessive texting" or "sexually explicit texting" does not render Fetchick's conduct permissible under the General Orders.

The second violation sustained by the Sheriff was a violation of General Order #1, XI.C.2. Duty Assignments, which provides that "[e]mployees shall not be absent from duty, post or assignment without authorization." This violation was based on Inspector Conway's finding—with which Sergeant Fowler and LaRue's supervisor concurred—that text messages from October 10, 2013, along with analysis of the route and distance to LaRue's residence from Milwee, indicated that on that date Fetchick left Milwee in the early afternoon and drove to LaRue's house to have sex.[14]  Although Fetchick and LaRue both denied that this happened in their interview with Inspector Conway, Fetchick merely contests the conclusion reached by Inspector Conway and does not challenge that Inspector Conway reached that conclusion in good faith.  Moreover, it is a reasonable conclusion.

The third violation cited by the Sheriff in the Notices was a violation of General Order #1, XIV, Conduct Toward Supervisors, Subordinates, and Peers.  That provision provides in part that employees "shall treat their superiors, subordinates, and peers with respect" and "shall be courteous and civil at all times in their relationships with one another."  The Sheriff agreed that Fetchick violated this provision when he made the comment to the

---

[14] During the October 10 text exchange, Fetchick wrote at 1:05 p.m. that he was "51 [en route]." (Administrative Investigation Report at 9).  Nineteen minutes later, he wrote "I'm on [S]anford [A]venue," and three minutes after that he wrote that he was "pulling up in front of house." (Id.).  Inspector Conway noted in his Report that "the time . . . it took [Fetchick] to drive to LaRue's residence [as indicated by the time stamps of the messages] is consistent with the amount of time it takes to drive from Milwee Middle School to LaRue's residence." (Id. at 52; see also Conway Dep. at 41 ("It just didn't make sense that they would have this fantasy conversation that also coincidentally the timeline aligns with the amount of time it would take to drive that distance.")).

pregnant Milwee teacher about the identity of the father of her child and when he and LaRue exchanged text messages in November 2013 that were disrespectful toward Fetchick's supervisor, Sergeant Fowler. Fetchick does not dispute that the comments were made; he merely disagrees that they constitute a violation of the General Order.

The fourth violation listed by the Sheriff was a violation of General Order #1, II. Scope, which provides in part that employees "will not engage in any conduct that constitutes neglect of duty, conduct unbecoming, or any act likely to adversely affect the discipline, good order, or reputation of the Sheriff's Office." In this regard, the Sheriff noted the on-duty exchange of more than 6,000 text messages over a nine-week period, including many sexually explicit messages and a photograph of Fetchick's penis. The Sheriff then stated: "The sheer amount of messages exchanged between you and LaRue during work hours constitutes a neglect of duty." (Discipline Notices at 2). The Sheriff further noted that the principal of Milwee "stated that you were not performing all of your required duties as a school resource deputy" and recalled "at least two occasions when law enforcement services were needed, but you were not on the campus and did not notify [the principal] that you were leaving the campus." (Id.). Again, Fetchick does not contest that the messages and the photograph were sent, and there is no evidence that the principal did not report Fetchick's conduct as noted. Fetchick merely asserts an "entitlement" to text anybody he wants using his personal cellular telephone during working hours and disagrees with the principal's assessment of his job performance.[15]

---

[15] Inspector Conway asked Fetchick during the investigation whether in his opinion the number of text messages he sent to LaRue while on duty constituted neglect of duty, and Fetchick responded, "I don't feel it does, um I was still able to do my rounds and I was doing what I was supposed to do, and what the administration of the school wanted me to do." (Ex. 18 to Fetchick Dep., at 2).

The fifth violation with which the Sheriff concurred was the violation of General Order #31, X.M.2.c. PowerDETAILS—Prohibited Actions, which pertains to signing other deputies up for extra duty details. Fetchick admitted committing this violation.

Finally, the Sheriff agreed that Fetchick violated General Order #1, XII.C.2. False Statements and Reports, which requires employees "to fully, truthfully and directly answer all questions" in administrative investigations. The Sheriff agreed with Inspector Conway's conclusion that during Fetchick's interview Fetchick did not "fully, truthfully, and/or directly answer all inquiries." (Discipline Notices at 2). The Sheriff noted that Fetchick stated that his sexual relationship with LaRue began in November 2013, while LaRue testified that it did not begin until late December 2013—after both had been placed on administrative suspension. (Id.). The Sheriff noted that the text messages, however, suggest that the sexual relationship had begun by at least late September 2013. (Id.).[16] The Sheriff further noted that Fetchick denied going to LaRue's house on October 10 to have sex while on duty, yet the text messages indicated otherwise and the timing on the text messages coincides with the time it would take to drive from Milwee to LaRue's residence. (Id.). Additionally, the Sheriff noted that Fetchick's denial of LaRue's October 23 visit was contradicted by the text messages. (Id.).

The record evidence does not cast doubt on the veracity or good faith of the Sheriff's reasons or support a conclusion that Fetchick's extramarital relationship with LaRue was a substantial or motivating factor in his termination. There is overwhelming evidence of numerous violations of policy, and Fetchick cannot "seriously contend . . . that a police

---

[16] Indeed, the messages strongly support the conclusion that the sexual relationship had begun by at least late September or early October. (See Administrative Investigation Report at 5–10).

officer has a constitutionally protected right to engage in otherwise prohibited conduct simply because he is engaged in an extramarital affair." Smith, 616 F.2d at 1376.

Moreover, the Sheriff has presented evidence that other SCSO employees had extramarital affairs and were not disciplined unless they were in a superior-subordinate relationship, which is prohibited by policy. (See Bosco Dep., Ex. C. to Doc. 60, at 17; Ballou Dep., Ex. H to Doc. 60, at 16–17; Benedetto Dep., Ex. I to Doc. 60, at 15 & 22). One witness testified that SCSO "doesn't look into affairs specifically unless there's evidence that some sort of misconduct [such as] sex on duty[] occurred." (Bosco Dep. at 29). Here, Michelle came forward to SCSO alleging that the iPad contained messages showing that a sexual relationship occurred while on duty; that allegation led to the administrative investigation of Fetchick. (Id.). This "tend[s] to show that the [SCSO] was more concerned about [Fetchick's] . . . neglect of duty. . . than it was with the extramarital sexual relationship itself." Smith, 616 F.2d at 1378–79. There is no evidence of a policy barring extramarital relationships, nor is there evidence that in this instance the relationship itself—extramarital or otherwise—motivated the Sheriff to terminate Fetchick.

In sum, Fetchick is understandably upset that his now ex-wife made a complaint to SCSO about him that led to an investigation of his on-the-job conduct and, ultimately, to his termination. But Fetchick's conduct unquestionably violated SCSO policies, and the record evidence does not present a genuine issue of material fact regarding whether Fetchick was terminated for an unconstitutional reason rather than for the numerous policy violations that Fetchick unquestionably committed. The Sheriff's motion therefore must be granted.

IV.   **Conclusion**

It is **ORDERED** as follows:

1.   Defendant's Case Dispositive Motion for Summary Judgment (Doc. 60) is **GRANTED** as to Count I of the Second Amended Complaint (Doc. 29)—the only remaining claim.

2.   All other pending motions are **DENIED as moot**.

3.   The Clerk is directed to enter a judgment providing that Plaintiff takes nothing from Defendant on any of his claims in this case.   Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida, on March 20, 2017.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

19